Rene L. Valladares
Federal Public Defender
Nevada State Bar No. 11479
*Jeremy C. Baron
Assistant Federal Public Defender
District of Columbia Bar No. 1021801
411 E. Bonneville Ave. Suite 250
Las Vegas, Nevada 89101
(702) 388-6577
jeremy_baron@fd.org


*Attorney for Petitioner Jason Mathis

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Jason Mathis, | |
| Petitioner, | Case No. 3:22-cv-00091-ART-CLB |
| v. | **First amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254** |
| Nethanjah Breitenbach, Warden, Northern Nevada Correctional Center; James Dzurenda, Director, Nevada Department of Corrections; and Aaron Ford, Nevada Attorney General, | |
| Respondents. | |

### INTRODUCTION

The State accused Mr. Mathis and a co-defendant, Andre Dow, of murdering two individuals as part of an alleged dispute between the San Francisco and Kansas City hip hop communities.  At Mr. Mathis's trial, the State introduced into evidence a critical hearsay statement from Mr. Mathis's former romantic partner, Chanel Rowel.  According to the State, Mr. Mathis and Ms. Rowel got into a heated argument in San Francisco after the murders took place.  The police responded to the argument. When they arrived, Ms. Rowel supposedly told Inspector Robert McMillan that Mr. Mathis had committed a double homicide and was wanted in Las Vegas.  According to the State and the trial court, Ms. Rowel's statement was an excited utterance and therefore admissible.  The trial court allowed the State to elicit Ms. Rowel's hearsay statement through Inspector McMillan.  That hearsay statement suggested Mr. Mathis made incriminating comments to Ms. Rowel about the Las Vegas murders.

Mr. Mathis is entitled to a new trial based on the admission of this hearsay statement.  First, admitting the statement created a confrontation clause problem. Second, the trial attorney made ineffective attempts to exclude the statement under the hearsay rules.  Third, Mr. Mathis has strong reason to believe there's undisclosed impeachment information regarding Inspector McMillan, who testified about this alleged hearsay statement; the Court should grant Mr. Mathis subpoena power to investigate this issue.  For these reasons and others, the Court should grant Mr. Mathis a writ of habeas corpus.

### PROCEDURAL HISTORY

### I.    Someone shoots and kills Anthony "Fat Tone" Watkins and Jermaine "Cocaine Cowboy" Akins.

This case involves a double homicide in the Las Vegas area.  According to the prosecution, the saga began in Kansas City, Missouri, when someone shot and killed well known Bay Area hip hop artist Andre "Mac Dre" Hicks in November 2004.  Tr.

7/24/08 at 146. Mac Dre was in Kansas City for a concert. *Id.* at 147. Someone shot at his car while he and his entourage were driving. *Id.* Mac Dre died in the shooting. *Id.* Rumors began to swirl that the person who killed Mac Dre was Anthony "Fat Tone" Watkins, a hip hop artist from Kansas City. *Id.* at 147-48. The police investigated Mr. Watkins as a potential suspect, but they concluded he had a legitimate alibi, and they developed strong evidence against other suspects. *Id.* at 148-49. The police put out a statement clearing Mr. Watkins as a suspect, but rumors nonetheless continued circulating that Mr. Watkins was the culprit. *Id.* at 151-52.

Andre "Mac Minister" Dow is a hip hop artist from the Bay Area. Tr. 7/18/08 at 15-22. He was a contributing artist on albums released by high-profile hip hop artists like Snoop Dogg. *Id.* at 21-22. As part of his musical career, Mr. Dow was working to start his own record label and develop up-and-coming hip hop artists. Mr. Watkins was one of those artists. *Id.* at 20. Between 2003 and 2005, Mr. Dow was trying to sign Mr. Watkins and was promoting him. *Id.* at 33, 70-72, 85, 168. After Mac Dre's death, Mr. Dow and Mr. Watkins went to Houston together to meet with various musicians. *Id.* at 37-55; Tr. 7/24/08 at 204-06. On another occasion after Mac Dre's death, Mr. Dow and Mr. Watkins went to San Francisco together for a week. Tr. 7/18/08 at 88-90; Tr. 7/24/08 at 204-06.

In May 2005, Mr. Watkins went to Las Vegas for a Snoop Dogg concert. Tr. 7/24/08 at 186. Mr. Watkins believed Mr. Dow was going to introduce him to Snoop Dogg. *Id.* at 68-69, 188-89. Mr. Watkins made the trip along with his friend Jermaine "Cocaine Cowboy" Akins and Mr. Watkins's girlfriend Kimberly Brown. *Id.* at 187-92. They stayed at the MGM casino. *Id.* The trio spent time in Las Vegas with Mr. Dow. *Id.*

On the evening of May 22, 2005, Mr. Dow came to the MGM hotel room to see the trio; he brought along his girlfriend, Tanisha Aaron. Tr. 7/28/08 at 46-47. The five of them left the room together. *Id.*; *see also* Tr. 7/24/08 at 172-79. Ms. Brown

and Ms. Aaron split off from the group and went to a club at the Bellagio; Ms. Aaron left Ms. Brown at the club at about 3:00 a.m.  Tr. 7/24/08 at 194-96.

At about 1:00 a.m. on May 23, 2005, residents of the Southern Highlands area heard gunshots.  Tr. 7/23/08 at 134-51.  One of the residents called 911.  *Id.* at 147-48.  Another resident noticed a white Pontiac Sunfire driving away at a high rate of speed with no headlights on; the car failed to stop at a stop sign.  *Id.* at 138-39.

At about 4:00 a.m., a private security guard was patrolling Southern Highlands.  Tr. 7/23/08 at 123-28.  The security guard came across the scene of a double homicide.  *Id.*  Mr. Watkins and Mr. Akins were found shot and killed near a blue Toyota Tercel.

The police responded to process the scene.  They found an MGM players club card with Mr. Watkins's name on it.  Tr. 7/23/08 at 82.  They found a cigarette butt and beer can near the crime scene.  The police crime lab eventually processed those items for DNA and got DNA reference profiles from Mr. Dow and Mr. Mathis; Mr. Dow and Mr. Mathis were both excluded from the DNA found on these items.  Tr. 7/24/08 at 137.

The police collected multiple bullet casings and bullet fragments from the scene.  All the casings were Wolf brand 7.62 x 39 caliber ammunition.  Tr. 7/24/08 at 260.  The ballistics expert concluded the casings were all fired from the same gun, consistent with an AK-47 style gun like a WASR-10.  *Id.* at 260-63.  The ballistics expert determined the bullet fragments were consistent with two different calibers of bullets: 7.62 x 39 caliber, as well as a nominal .38 caliber.  *Id.*  The State therefore concluded there were two guns used during the murders.

The police found a CD in the Toyota Tercel.  Fingerprints on the CD matched Mr. Dow.  Tr. 7/25/08 at 91-93.  Fingerprints on the exterior of the car matched Ms. Aaron.  *Id.*

The coroner examined both bodies and concluded the victims died from gunshot wounds. Mr. Watkins was shot mostly from behind. Tr. 7/24/08 at 41-42. Mr. Akins's body contained gunshots that were apparently targeted at his extremities, along with numerous additional unusual wounds; his wounds were consistent with a prolonged killing process and potential torture. Tr. 7/24/08 at 29-31, 38, 46-54, 65.

The police received an anonymous call alleging the blue Toyota from the crime scene was associated with a specific address on Zampino Street in Southern Highlands. Tr. 7/28/08 at 47. The police canvassed the area and spoke to a neighbor who lived across the street from the Zampino house. *Id.* at 48. He'd seen Mr. Mathis and Mr. Dow at the house and assumed they were the primary residents. Tr. 7/24/08 at 93. He'd noticed Mr. Dow driving the same blue Toyota found at the crime scene. *Id.* at 83-84. He became suspicious in May 2005 when he saw lots of cars coming and going to and from the house, so he began writing down the corresponding license plate numbers, including for a white Pontiac Sunfire. *Id.* at 80-81. He gave the police that plate number. Tr. 7/28/08 at 48. It came back to a woman named Lee Denae Laursen. *Id.* at 48. Ms. Laursen was from Utah and had been living with Mr. Mathis in Las Vegas. Tr. 7/25/08 at 120-22.

The police received a search warrant for the Zampino house. They found various firearm paraphernalia, including an assault rifle magazine. Tr. 7/25/08 at 77. Mr. Mathis's fingerprints were on some of the paraphernalia. *Id.* at 87-89. The police also found registration information for the Toyota Tercel in Ms. Aaron's name. Tr. 7/28/08 at 54-55. They found a copy of the lease for the house; the lease listed Mr. Mathis as a resident, along with a woman named Desiree Daffron. *Id.* at 55-56.

The police ran a check through the Bureau of Alcohol, Tobacco, and Firearms; they received documentation showing Ms. Daffron purchasing a WASR-10 rifle. Tr. 7/28/08 at 59-60; *see also* Tr. 11/1/05 at 14-16. After publicizing Mr. Mathis as a person of interest in the case, the police received a call from Michael Morrissey, a local

gun store owner.  Tr. 7/28/08 at 60.  According to Mr. Morrissey, Mr. Mathis was a repeat customer at his store.  Tr. 7/24/08 at 211.  Mr. Mathis had the store put a custom folding stock on the WASR-10.  *Id.* at 214.  The gun takes 7.62 x 39 caliber ammunition.  *Id.* at 217.  Mr. Mathis and a woman who wasn't Ms. Daffron came into the store on May 14, 2005, to buy Wolf brand ammunition for the gun; they were driving a white Pontiac Sunfire.  *Id.* at 219-28.

On May 25, 2005, the police found Ms. Laursen's Pontiac Sunfire burned in Vallejo, California.  Tr. 7/24/08 at 97-98.  According to the fire department, the fire was probably intentionally set.  *Id.* at 101-04.

On July 12, 2005, Inspector Robert McMillan responded to a call for service based on an argument between Mr. Mathis and the mother of his child, Chanel Rowel (a/k/a Meka Brown).  Tr. 7/28/08 at 10.  After he arrived, Ms. Rowel supposedly told Inspector McMillan that Mr. Mathis had killed two people in Las Vegas and the police in Las Vegas were looking for him.  *Id.* at 13.  The police arrested Mr. Mathis for reasons unrelated to the Las Vegas case.  He remained in custody in San Francisco until his extradition to Las Vegas in this case.

The San Francisco police conducted a formal interview with Ms. Rowel on July 12, and the Las Vegas police conducted a second formal interview with her on July 14.  5/18/07 Motion Exhibit C, Exhibit D.  She claimed Mr. Mathis spoke to her after the murder and made multiple incriminating statements about his involvement. Ms. Rowel then recanted to a defense investigator and claimed no such conversation ever happened.  1/18/07 Motion Exhibit A; 5/18/07 Motion Exhibit F.

On July 14, 2005, the California highway patrol stopped Mr. Dow while he was driving in a rental car.  Tr. 7/25/08 at 110-13.  Mr. Dow drove away in the middle of the stop, and a chase ensued.  *Id.*  The police later found the car abandoned in a random driveway.  *Id.* at 115-16.  The police searched the car and found Ms. Aaron's name on the rental contract.  Tr. 7/28/08 at 28.  They also found a DVD with a

recording of Mr. Dow hanging out with Snoop Dogg at a party. *Id.* at 26-27. Mr. Dow later showed up at the police station to turn himself in on a warrant tied to the chase and bailed himself back out. Tr. 7/25/08 at 116-18.

After Mr. Mathis's arrest, Ms. Laursen apparently began associating with Mr. Dow. Tr. 7/25/08 at 123, 130. The grand jury ultimately indicted Mr. Mathis and Mr. Dow in November 2005. 11/2/05 Indictment. At the time, an attorney named Keith Brower was representing Mr. Mathis. Tr. 7/16/08 at 227. Mr. Brower had previously represented Mr. Dow on another case. *Id.* at 228. Mr. Dow had asked Mr. Brower to let him know if he got indicted. *Id.* at 229. Once the indictment issued, Mr. Brower tried calling Mr. Dow unsuccessfully. *Id.* at 230. He eventually tried calling Ms. Laursen instead and got through. *Id.* He said he wanted to talk to Mr. Dow, and she passed the phone over. *Id.* He told Mr. Dow he'd been indicted and advised him to hire another attorney. *Id.* at 230-31.

Later that night, Ms. Laursen was found dead, shot in the back of the head in Fairfield, California. Tr. 7/17/08 at 50-57. Also that night, the Richmond, California, police found a burned 2002 Saturn registered to Mr. Mathis. *Id.* at 58, 68-70. The ballistics evidence showed the bullets used in Ms. Laursen's murder were nominal .38 caliber, although the ballistics evidence from those bullets was inconsistent with the ballistics evidence from the .38 bullet jacket fragments found at the Las Vegas crime scene. Tr. 7/16/08 at 88-89; Tr. 7/17/08 at 83.

The police had trouble locating and arresting Mr. Dow; he eventually appeared on America's Most Wanted. Tr. 7/17/08 at 111-13. They eventually got a tip on a location. *Id.* The police arrived to the location, and Ms. Aaron opened the door. *Id.* at 118-19. After a couple hours of negotiating, Ms. Aaron let them in. *Id.* at 117-18. They found Mr. Dow hiding under a pile of clothes. *Id.* at 119-20.

Mr. Mathis was in the Clark County Detention Center while awaiting trial in this case. A corrections officer from the jail testified he had an argument with

Mr. Mathis in October 2005.  Mr. Mathis supposedly said he was a gangster and a double murderer.  Tr. 7/25/08 at 136-37.  Mr. Mathis maintains he said he was "*in*" for a double *murder*, not that he *was* a double *murderer*.  *Id.* at 139; *see* 2/3/12 Petition Exhibit 2; PEx. 2.

In July 2007, an inmate named Barbara Carpenter approached the police.  She claimed she was able to speak with Mr. Mathis through vents in the jail.  Tr. 7/25/08 at 22-23.  Mr. Mathis had written hip hop songs while in jail and performed some of the songs for her.  The prosecution thought some of the lyrics were incriminating.  *Id.* at 26-28.  Ms. Carpenter claimed Mr. Mathis confessed to killing two people.  *Id.* at 31-32.  According to her, Mr. Mathis said the killing was in retaliation for Mac Dre's death.  *Id.* at 31-37.  He supposedly threatened her if she told the police what he said.  *Id.* at 26-28, 38.

Based on Ms. Carpenter's statement, the police received a warrant to search Mr. Mathis's cell for papers containing incriminating statements.  Tr. 7/28/08 at 99; *see also* 1/4/08 Motion to Suppress.  The police seized papers containing rap lyrics, including but not limited to lyrics that matched the lyrics Ms. Carpenter quoted.  *Id.* at 100.  At trial, the detective quoted from multiple rap lyrics at length.  *Id.* at 100-04, 136.

## II.    The State prosecutes Mr. Dow and Mr. Mathis for the Las Vegas murders.

The prosecution brought the case to a grand jury.  Tr. 10/25/05; Tr. 11/1/05.  The grand jury issued an indictment charging Mr. Dow and Mr. Mathis with murder.  11/2/05 Indictment.

Mr. Mathis filed a severance motion.  5/18/07 Motion; *see also* 2/6/08 Motion; 5/19/08 Brief; 5/27/08 Briefs.  The court ordered Mr. Mathis and Mr. Dow's trials severed because evidence regarding Ms. Laursen's murder was admissible as to Mr. Dow but not as to Mr. Mathis.  Tr. 5/29/08 at 3.

8

Mr. Dow's trial proceeded first.  He presented an alibi defense, with two witnesses testifying he was at the parking lot of a local radio station hanging out with a DJ and other individuals from San Francisco at the time of the crime.  Tr. 7/18/08 at 104-07, 129-32.  The jury found Mr. Dow guilty of two counts of first-degree murder and two counts of conspiracy to commit murder.  7/21/08 Verdict (Liability).  The case proceeded to a non-capital penalty phase.  Mr. Dow was willing to waive jury sentencing, but the prosecution refused.  Tr. 7/21/08 at 22.  The jury imposed life without parole.  7/21/08 Verdict (Penalty).

Mr. Mathis's trial proceeded immediately after Mr. Dow's.  The jury found him guilty of two counts of first-degree murder and two counts of conspiracy to commit murder.  7/29/08 Verdict (Liability).  The case proceeded to a non-capital penalty phase.  Mr. Mathis was willing to waive jury sentencing, but the prosecution again refused.  Tr. 7/30/08 at 4-10.  The jury imposed life without parole.  7/30/08 Verdict (Penalty); *see also* 10/8/08 Judgment.

Mr. Mathis appealed.  *See* 4/22/10 Opening Brief; 6/24/10 Answering Brief.  The Nevada Supreme Court affirmed.  6/30/11 Order; *see also* 7/25/11 Remittitur.

Mr. Mathis filed a pro se state post-conviction petition.  2/3/12 Petition.  The state district court denied the petition without appointing counsel.  5/14/12 Notice of Entry.  Mr. Mathis appealed.  In the interim, the district court reconsidered its decision and decided to appoint an attorney for Mr. Mathis.  *See* 1/24/13 Request.  The Nevada Supreme Court remanded the case.  4/10/13 Order.

The newly appointed state post-conviction attorney filed a counseled supplemental petition.  10/30/14 Petition.  The state district court conducted an evidentiary hearing.  Tr. 1/24/19; Tr. 4/23/19.  The court denied the petition.  7/11/19 Notice of Entry.  Mr. Mathis appealed.  *See* 1/3/20 Opening Brief; 1/30/20 Answering Brief; 3/16/20 Reply Brief.  The Nevada Supreme Court affirmed.  11/13/20 Order; *see also* 12/8/20 Remittitur.

Mr. Mathis filed a case-initiating document in this Court on or about February 8, 2022.  ECF No. 5.  He then filed a federal habeas petition on or about July 7, 2022.  ECF No. 6.  The Court appointed the Federal Public Defender, District of Nevada, to represent Mr. Mathis.  ECF No. 11.  It authorized counsel to file this first amended petition.  ECF No. 15.

### STATEMENT REGARDING 28 U.S.C. § 2254(d)

For each ground for relief in this petition, Mr. Mathis alleges any rulings from the Nevada appellate courts denying him relief on the merits are (or would be) (1) contrary to, and/or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Mr. Mathis also asserts for the purposes of further review that the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen).  *But see Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007) (rejecting some of these arguments).

### Grounds for Relief

**Ground One:  The trial court allowed testimony about a declarant's out-of-court testimonial statement, violating Mr. Mathis's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

**Statement regarding exhaustion:**  Mr. Mathis litigated this claim or a substantially similar claim in his direct appeal.

**Statement in support of claim:**

At trial, the court allowed the prosecution to elicit evidence from San Francisco Police Department Inspector Robert McMillan about a statement made by Chanel Rowel (Mr. Mathis's former romantic partner).  According to Inspector McMillan, Ms. Rowel told him Mr. Mathis had killed two people in Las Vegas.  That testimony (and other related testimony) suggested Mr. Mathis made incriminating statements to Ms. Rowel.  The admission of this testimonial statement violated Mr. Mathis's confrontation clause rights.  *See Crawford v. Washington*, 541 U.S. 36 (2004).  Mr. Mathis is therefore entitled to a new trial.

This claim involves an incident in the San Francisco area on July 12, 2005.  According to a police report written by Officer Brett Bodisco, the police responded to a disturbance involving Ms. Rowel, Mr. Mathis, and Ms. Laursen.  10/30/14 Supplemental Petition at 767.  After the police calmed everyone down, Officer Bodisco spoke to Ms. Rowel.  *Id.*  She said Mr. Mathis was upset with her because they'd had an argument two days earlier about their two-year-old child.  *Id.*  On July 12, Mr. Mathis and Ms. Laursen drove by and pulled up to Ms. Rowel while she was walking home.  *Id.*  Ms. Rowel ran away, but Mr. Mathis caught up to her and pinned her up against her back door.  *Id.*  Her phone rang; Mr. Mathis snatched it out of her hand and threw it away.  *Id.*  Ms. Rowel's brother came out and separated the pair.  *Id.*  Ms. Rowel wanted Mr. Mathis arrested, so she went back to their car and tried to take the car keys away so Mr. Mathis couldn't leave.  *Id.*  Ms. Laursen was still in the car, and

she pepper-sprayed Ms. Rowel. *Id.* Ms. Rowel began to stumble around, and Mr. Mathis grabbed her and pulled her by her hair until her brother was able to separate them again. *Id.* The police arrived shortly after. *Id.* Officer Bodisco also spoke to Ms. Rowel's brother, who "reiterated the same as Rowel." *Id.* Nowhere in this report does it memorialize Ms. Rowel saying Mr. Mathis either threatened to kill Ms. Rowel or referenced the Las Vegas double homicide during the disturbance. Indeed, the report fails to check a box for any "spontaneous statements" that Ms. Rowel might've made at the scene. *Id.* at 769.

The police realized Mr. Mathis had a warrant for his arrest for another charge, so they arrested him on that warrant. 10/30/14 Supplemental Petition at 767. They also booked him for a domestic violence charge against Ms. Rowel and a driving infraction. *Id.* at 767-68. The police found cannabis in the car. *Id.* at 768.

Inspector Robert McMillan responded to the scene of the disturbance on July 12, 2005. 10/30/14 Supplemental Petition at 767. That same day, he conducted an interview with Ms. Rowel regarding the Las Vegas double homicide. 5/18/07 Motion Exhibit C. (Inspector McMillan prepared also prepared a summary report regarding the interview. PEx. 1.) According to Ms. Rowel, Mr. Mathis spoke to her after the double homicide took place and made detailed incriminating statements about his and Mr. Dow's involvement in the crime. The admissions Mr. Mathis allegedly made to Ms. Rowel were consistent with the prosecution's theory of the case. Nowhere in this interview does Ms. Rowel say Mr. Mathis either threatened to kill Ms. Rowel or referenced the Las Vegas double homicide during the July 12 disturbance.

Las Vegas detectives travelled to San Francisco to conduct a second interview with Ms. Rowel on July 14, 2005. 5/18/07 Motion Exhibit D. Ms. Rowel again claimed Mr. Mathis made incriminating statements to her about the crime. She also claimed Mr. Mathis made comments during the July 12 incident that were threatening toward Ms. Rowel and that referenced the Las Vegas case. *Id.* at 13. This statement

appears to be the first documented occasion where Ms. Rowel alleged Mr. Mathis made a threatening statement to her on July 12 involving the Las Vegas case.

The domestic violence case proceeded to a preliminary hearing in San Francisco on July 27, 2005.  The prosecution called Officer Robert Yick and Officer Brett Bodisco to testify about their conversations with Ms. Rowel and her brother.  The defense called Ms. Rowel to testify.  She said that when Mr. Mathis showed up at her residence, she was angry because Mr. Mathis had brought his new girlfriend Ms. Laursen along instead of coming by himself.  10/30/14 Supplemental Petition at 1355.  She started arguing with Ms. Laursen and tried to take the car keys, at which point Ms. Laursen pepper sprayed her.  *Id.*  She testified Mr. Mathis didn't hit or injure her.  *Id.* at 1358.  She lied to the police about Mr. Mathis hitting and threatening her; she'd made those false statements out of revenge.  *Id.* at 1360-62.  The defense also called Ms. Laursen to testify; her testimony was consistent with Ms. Rowel's.  *Id.* at 1368-74.

After Ms. Laursen's murder, a detective from the relevant California jurisdiction contacted Inspector McMillan.  6/16/08 Motion Exhibit A.  Inspector McMillan told the detective about the July 12 incident.  Nowhere in the report does it appear Inspector McMillan claimed Ms. Rowel made a spontaneous statement at the scene of the incident that involved the Las Vegas case.

Mr. Mathis's attorney assigned an investigator to speak to Ms. Rowel ahead of trial.  Ms. Rowel signed an affidavit for the investigator on July 4, 2006.  5/18/07 Motion Exhibit F.  Her affidavit describes the incident on July 12, 2005, and is consistent with her testimony at the preliminary hearing.   According to the affidavit, once the police arrived at the scene, she told them Mr. Mathis was wanted for murder in Las Vegas, and she said there were news articles online about the case.  She then gave details about the case to the police.  Those details were from her own internet research; Mr. Mathis never confessed anything to her.  The investigator also recorded

his corresponding conversation with Ms. Rowel and prepared a transcript of the conversation, which is consistent with the affidavit. 1/18/07 Motion Exhibit A.

Leading up to trial, the parties made multiple efforts to secure Ms. Rowel's attendance. The State filed pleadings in 2006 suggesting they were having difficulty serving her with subpoenas. 2/7/06 Request; 8/16/06 Request. The defense filed a motion in early 2007 suggesting the court authorize the parties to take her deposition in advance of trial to prevent any issues securing her appearance. 1/18/07 Motion. The State opposed the motion. 2/2/07 Opposition; *see also* 2/8/07 Reply; 2/9/07 Supplemental Reply. At a status check, the prosecution said that if Ms. Rowel didn't appear for trial, then none of her statements would be admissible. Tr. 2/12/07 at 4-5. On that basis, the court declined to authorize a deposition. *Id.* at 5. At a later status check, the prosecution changed its mind and suggested it would be appropriate to depose Ms. Rowel. Tr. 7/17/07 at 7-8; *see also* Tr. 7/10/07 at 16-19. The prosecution again reiterated Ms. Rowel's statements would be inadmissible unless she appeared at trial (or was deposed). Tr. 7/10/07 at 16-19.

The court conducted another status check. The prosecution said Ms. Rowel had reached out again to San Francisco investigators and was now claiming she was threatened into recanting; at this point, she was avoiding service. Tr. 8/14/07 at 9. The parties again discussed a potential deposition or material witness warrant; they appeared to agree Ms. Rowel's statements would be inadmissible if she failed to appear for trial (or a deposition). *Id.* at 24-27.

At another status check, the prosecution said the San Francisco authorities had arrested Ms. Rowel on a material witness warrant, but the San Francisco court ordered her released. Tr. 2/8/08 at 68-69.

During Mr. Dow's trial, the prosecution called Inspector McMillan in part to discuss the July 12, 2005, incident. The prosecution asked whether Ms. Rowel said something to Inspector McMillan when he arrived. Tr. 7/17/08 at 107. The defense

raised a hearsay objection. *Id.* The court concluded the statement was admissible as an excited utterance and overruled the objection. *Id.* Inspector McMillan said Ms. Rowel told him "you need to arrest [Mr. Mathis] because he killed two people in Las Vegas and they're looking for him down there." *Id.* at 107-08.

After that testimony, Mr. Mathis filed a motion in limine to exclude this statement from his trial. 7/21/08 Motion. The motion cited *Crawford*. *Id.* at 4, 6 & n. 1. The State opposed the motion. 7/22/08 Response.

At the start of Mr. Mathis's trial, the parties made a record about the issue. The prosecution and the court suggested Ms. Rowel would willingly appear at trial at Mr. Mathis's request but was otherwise refusing to cooperate with the State. Tr. 7/23/08 at 7. Thus, in the court's view, there was no confrontation problem. *Id.* The defense attorney disputed the notion that either he or Mr. Mathis was in contact with Ms. Rowel. *Id.* at 7-8. The defense objected under *Crawford*. *Id.* at 8. (According to the transcript, the attorney said, "It violates proffer"; in context, the attorney is obviously saying the phonetically similar term *Crawford*, not "proffer.") The parties then argued at length about whether Ms. Rowel's statement to Inspector McMillan (about Mr. Mathis killing two people in Las Vegas) was admissible under the hearsay rules. *Id.* at 8-14; *see also id.* at 37-39. The court deferred decision. *Id.* at 13-14.

The parties continued to discuss this issue at length during the next trial day; the court ruled the statement was admissible. Tr. 7/24/08 at 114-27. The defense again referenced *Crawford*. *Id.* at 116.

Inspector McMillan testified at Mr. Mathis's trial. He said he responded to the scene of the disturbance on July 12, 2005, and saw Mr. Mathis and Ms. Rowel arguing. Tr. 7/28/08 at 11-13. When Inspector McMillan arrived, Ms. Rowel said to him, "he killed two people in Las Vegas they're looking for him down there." *Id.* at 13. The court overruled the defense's hearsay objection. *Id.* The prosecutor asked whether Inspector McMillan eventually took "a tape recorded statement from her"; he said he

did. *Id.* at 14. The defense objected; the court sustained the objection and told the prosecution not to go there; the defense requested a mistrial. *Id.* The prosecutor asked if Las Vegas homicide detectives came to San Francisco; the defense requested a sidebar; and after a bench conference the prosecutor moved on to discuss Mr. Dow's flight from the traffic stop (which took place when the Las Vegas homicide detectives were in San Francisco). *Id.* at 14-15.

Later that same day at trial, the prosecutor asked a Las Vegas detective whether Ms. Rowel gave the police non-public information about the crime. Tr. 7/28/08 at 72-73. The defense objected, and the court overruled the objection. *Id.* The detective said she did. *Id.*

During the state post-conviction proceedings, the defense called Ms. Rowel to testify at an evidentiary hearing. She described the July 12, 2005, incident; her testimony was generally consistent with her San Francisco preliminary hearing testimony. Tr. 1/24/19 at 9-16. She said she told the police Mr. Mathis was wanted for murder in Las Vegas because she felt betrayed that Mr. Mathis was dating someone else and she wanted Mr. Mathis to be arrested. *Id.* at 15-16. There was much about the case she didn't recall, but she maintained that when she told the police Mr. Mathis made incriminating statements to her, that was a lie. *Id.* at 31-48, 53-54.

Inspector McMillan's testimony about Ms. Rowel's hearsay statement—that Mr. Mathis had killed two people in Las Vegas—was inadmissible under the confrontation clause. The statement was testimonial. Ms. Rowel wasn't making this statement in an emergency or for the purpose of receiving aid—rather, she made the statement to Inspector McMillan out of spite, for the express purpose of retaliating against Mr. Mathis and getting him arrested for the murder charge. *See, e.g.*, 6/16/08 Motion Exhibit A (Inspector McMillan informs a Las Vegas detective that Ms. Rowel told Inspector McMillan "that Mathis had told her of his involvement in the double homicide in Las Vegas. Being upset with Mathis, [Ms. Rowel] advised this information to

Inspector McMillan and Mathis was subsequently arrested"). Because this statement was testimonial—it was explicitly designed to incriminate Mr. Mathis and lead to his arrest—the confrontation clause forbade its admission into evidence unless Ms. Rowel was present at trial for cross-examination. The trial court therefore violated Mr. Mathis's confrontation clause rights by admitting this statement. The error had a substantial and injurious effect on the verdict. Mr. Mathis is entitled to a new trial.

> **Ground Two: The State seized attorney-client privileged materials from Mr. Mathis's jail cell, violating Mr. Mathis's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

**Statement regarding exhaustion:** Mr. Mathis litigated this claim or a substantially similar claim in his direct appeal.

**Statement in support of claim:**

The police secured a search warrant to search Mr. Mathis's cell for potentially incriminating handwritten statements. The lead detective seized a wide variety of handwritten materials containing at least one arguably attorney-client privileged document. The lead detective personally reviewed the materials for relevance. This process violated Mr. Mathis's Sixth Amendment rights. Mr. Mathis is therefore entitled to a new trial.

The detective sought the warrant on August 1, 2007. 1/4/08 Motion Exhibit A. The warrant application sought "writings/letters of inmate Jason Mathis" from his "cell" or his "personal belongings" (i.e., a box of personal belongings stored at the prison outside Mr. Mathis's cell). *Id.* at 1 (cleaned up). For unclear reasons, the police had previously sought a search warrant for Mr. Mathis's outgoing mail from the jail. *Id.* at 2. Pursuant to that warrant, the police copied letters sent by Mr. Mathis to another jail inmate, Barbara Carpenter. *Id.* One letter references Mac Dre, along with another murdered Bay Area rapper Tupac Shakur, and states they "left it to me

1   . . . . I'm handling business." *Id.* (cleaned up).  The police thought that statement was

2   consistent with their theory of motive, i.e., that Mr. Watkins was killed in retaliation

3   for Mr. Watkins murdering Mac Dre.  *Id.*

4       According to the warrant application, the police interviewed Ms. Carpenter at

5   the jail on July 19, 2007.  Ms. Carpenter said she'd received letters from Mr. Mathis

6   and had spoken to Mr. Mathis through a vent in between their jail cells.  1/4/08 Mo-

7   tion Exhibit A at 2.  Ms. Carpenter said Mr. Mathis admitted to killing two people.

8   *Id.* at 3.  He also performed for Ms. Carpenter a hip hop song he wrote.  *Id.*  The lyrics

9   referenced "a boy behind a building with a hole in his chest and he won't say them

10  things again."  *Id.*  The police apparently thought that statement was relevant to the

11  double homicide.  *Id.*  In turn, the police concluded Mr. Mathis might "possess written

12  rap lyrics and/or other writings which may implicate him in the murders."  *Id.*  The

13  application therefore sought a warrant "to seize any writings/letters written by Jason

14  Mathis from his cell/personnel belongings at CCDC which may be related to this

15  case."  *Id.*

16      The lead detective received the warrant on August 1, 2007, and executed it the

17  same day with assistance from a correctional officer.  Tr. 2/8/08 at 31.  According to

18  the detective, he set aside certain papers that appeared to be potentially attorney-

19  client privileged; he "looked at" those documents "long enough to see what they were"

20  but "did not read them."  *Id.* at 32.  The detective seized a host of additional papers—

21  there were so many papers that the detective was unable to review them all for rele-

22  vance while the detective was in the cell.  *Id.*  The detective took additional papers

23  from Mr. Mathis's property box at the jail.  *Id.* at 33.  The detective then reviewed the

24  papers for relevance and sorted them into relevant and irrelevant piles.  *Id.*  The

25  detective gave the prosecutor a copy of the documents in the relevant pile and im-

26  pounded the irrelevant pile.  *Id.* at 34-35.

27

The defense filed a motion to suppress the documents. 1/4/08 Motion. The motion argued in part that the warrant impermissibly authorized the seizure of attorney-client privileged information. The defense separately filed a motion to dismiss the case for Sixth Amendment violations. 1/11/08 Motion. The motion again argued the police seized potentially attorney-client privileged materials. It attached a document that the defense maintained was privileged. *Id.* Exhibit A. And the defense separately filed a motion challenging the prosecution's refusal to return original copies of the seized privileged documents. 1/31/08 Motion.

The State opposed all three motions. It appeared to dispute whether the relevant document was privileged. 2/4/08 Opposition at 7. The defense filed a reply maintaining that document was privileged and explaining the police seized additional privileged documents. 2/7/08 Reply.

The court held a hearing on the motions. Tr. 2/8/08. The lead detective testified about the search process. The court provisionally denied the motions but stated it would review the seized documents from the irrelevant pile for additional potentially privileged materials. *Id.* at 63-64, 71. The court then reviewed those documents; it looked at all the documents but didn't read everything in detail. Tr. 2/13/08 at 3. The court concluded there were no privileged documents in that pile. *Id.* The court marked the box of supposedly irrelevant documents as a court exhibit. *Id.* at 5.

The execution of the warrant violated Mr. Mathis's Sixth Amendment rights. The lead detective in this case personally seized large amounts of papers from Mr. Mathis's cell under the theory Mr. Mathis might've written something incriminating. The detective proceeded to personally review those papers for relevance and potential privilege. The police and the prosecution failed to utilize a filter team to review the documents—instead, the lead detective conducted the entire review by himself. At least one of the documents was arguably privileged. The Sixth Amendment cannot tolerate a lead detective seizing handwritten materials—including

potentially privileged materials—from a defendant's cell and then personally review-ing those materials for relevance and privilege.  This Sixth Amendment error is struc-tural, and in the alternative it had a substantial and injurious effect on the verdict.  Mr. Mathis is entitled to a new trial.

> **Ground Three:  Mr. Mathis's attorney provided ineffective assis-tance at the liability phase of the trial, violating Mr. Mathis's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

**Statement regarding exhaustion:**  Mr. Mathis litigated this claim or a sub-stantially similar claim in his state post-conviction proceedings.

**Statement in support of claim:**

A criminal defendant has the right to effective assistance of counsel during trial.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Here, Mr. Mathis's trial attorney provided deficient performance during the liability phase of the trial in at least two different respects.  Those two errors were prejudicial, both individually and cumulatively.  Mr. Mathis is therefore entitled to a new trial.

### A.    The attorney failed to make appropriate objections to Ms. Rowel's hearsay statement.

As Ground One explains in detail, the prosecution elicited evidence at trial that Ms. Rowel told Inspector McMillan that Mr. Mathis had committed two murders in Las Vegas.  Another detective testified Ms. Rowel then spoke to the police and pro-vided the police with non-public information about the crimes.  The jury was therefore led to infer that Mr. Mathis admitted to Ms. Rowel that he committed the double homicide and provided Ms. Rowel with non-public information about the crime that only he could've known.

Mr. Mathis's attorney argued Inspector McMillan's testimony about Ms. Rowel's statement was inadmissible under the hearsay rules.  But the attorney provided a disjointed and confused argument regarding hearsay.  The attorney's

argument confused two hearsay rules—the prosecution and the court were focused on the excited utterance exception, but the attorney's argument incorrectly focused on the present sense impression exception. As a result, the attorney made an unpersuasive argument for exclusion. The error amounted to ineffective assistance.

Nevada has an exception to the hearsay rule for present sense impressions. NRS 51.075. "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, is not inadmissible under the hearsay rule." *Id.* Nevada also has an exception to the hearsay rule for excited utterances. NRS 51.095. "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition is not inadmissible under the hearsay rule." *Id.*

The attorney's argument confused the two exceptions. The attorney filed a motion in limine to exclude this testimony. 7/21/08 Motion. The motion argued primarily that the statement couldn't be an excited utterance because an excited utterance needs to be about the event that causes the excitement. Likewise, during the court proceedings, the attorney began by saying Ms. Rowel's statement wasn't "an excited utterance because you have to be observing the actual event and commenting on the event . . . during the period of excitement." Tr. 7/23/08 at 8.

Those arguments were off base. That rule—a declarant must be observing and commenting on the actual event—covers present sense impressions, not excited utterances. The attorney therefore confused the rules.

The attorney continued to argue the issue at trial and provided a hypothetical involving a declarant who watches a car run a red light and then makes comments about the car as the declarant is "observing this particular incident." Tr. 7/23/08 at 10. Again, that involves a present sense impression, not an excited utterance. The court tried to correct the attorney—it said the statement merely had to "relate[] to

the startling event"—but the attorney said the statement had to be made "[w]hile observing the event," which again mixes up the rules. *Id.* at 11.

The prosecutor explained the defense was "talking about the statement having to occur while the thing is being observed," which the court agreed was "present sense impression." Tr. 7/23/08 at 11. The court explained, "We're talking about an excited utterance that present sense impression does not have to occur." *Id.* at 11-12. The defense attorney expressed confusion: "oh, it's under the excitement -- . . . While you're excited -- . . . Under the excitement of the condition that caused your excitement." *Id.* at 12. The court invited the parties to submit further case law on the issue. *Id.* at 13.

The parties continued discussing the issue the next day. The court again suggested the defense attorney was mixing up present sense impression and excited utterance. Tr. 7/24/08 at 117. Eventually, the court remarked in a related context, "I'm not going to teach you the rules of evidence." *Id.* at 122.

The attorney provided deficient performance during the argument regarding the admissibility of Inspector McMillan's testimony regarding Ms. Rowel's alleged statement. The attorney focused his argument, incorrectly, on the present sense impression, when the prosecution was seeking to admit the statement under the excited utterance exception. The court had to correct the attorney repeatedly. The attorney's arguments fell below reasonable professional standards.

The error was prejudicial. Had the attorney had made a legally appropriate argument against admitting the statement under the excited utterance exception, and had the court responded to the argument reasonably, the court would've excluded the statement. In turn, there's a reasonable probability the jury would've returned a more favorable verdict had this damaging statement not come into evidence. Mr. Mathis is therefore entitled to a new trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**B.    The attorney failed to object to inadmissible and prejudicial rap lyrics.**

As Ground Two explains in detail, the police seized multiple handwritten documents from Mr. Mathis's jail cell. Those handwritten documents included rap lyrics Mr. Mathis had written while in custody. The trial court repeatedly suggested the rap lyrics were irrelevant and therefore inadmissible. But the defense attorney provided substandard efforts to ensure they were excluded. The error amounted to ineffective assistance.

The attorney filed a motion in limine that referenced these lyrics (among other evidence). 1/4/08 Motion. The attorney also filed a motion to preclude the State from calling an expert witness to discuss hip hop culture. 1/29/08 Motion. It appears the court never expressly ruled on either motion.

At a hearing that occurred soon after the attorney filed the motions, the court stated, "I have a hard time finding the relevance with . . . these lyrics, and I don't know . . . whether they mean something that has to do with this case." Tr. 2/8/08 at 38. Later, the court said, "I think the State has some relevance hurdles on some of this stuff . . . I'm not saying anything's admissible." *Id.* at 49. At the end of the hearing, the court said it would resolve the motion in limine at the next court date (February 13, 2008). *Id.* at 245. It doesn't appear the court explicitly ruled on the request to exclude the rap lyrics on that date (or subsequently).

At another status check, the attorney referenced the lyrics; the court said, "They're just crap. They're just crap." Tr. 3/21/08 at 30. It ruled that certain letters Mr. Mathis wrote to Ms. Carpenter were admissible, potentially including letters Mr. Mathis sent to Ms. Carpenter containing rap lyrics. *Id.* at 30-31. But "if it's just [a] general song that has nothing to do with Ms. Carpenter, I don't know that it has any materiality." *Id.* at 30. Again, it appears the court never expressly ruled the other rap lyrics were either admissible or inadmissible.

23

At trial, the prosecution elicited extensive evidence about the lyrics without any defense objection, including multiple sets of lyrics with no relevance to Ms. Carpenter. The lyrics were:

- "I'm the boogieman. I've got the streets terrified. They panickin' every time they slide through they say, momma there go that man again, they found the boy behind the building -- building stiff like a manikin. The boy was sending threats I bet he won't say them things again." Tr. 7/28/08 at 101.

- "Jill my life is real. If I get convicted for the crime when I get back on appeal." Tr. 7/28/08 at 101.

- "You lay face down, [correctional officers] yellin', man down, I thought I was playin' til I put my murder game down." Tr. 7/28/08 at 102 (cleaned up).

- "Will they have ski mask on plain aces. Give away clean or leave traces and watch friends of Jason now led to acts of betration. Greed, jealousy or lust always plays a factor in the homicide. Rolls over til the top blows then don't want the other man to be alive. Bullets get shot out the weapon penetrate flesh when the body they inside -- then the body they inside, making organs malfunction, shut down, then the body dies. Soul gets snatched worn on the killer's belt like a buckle." Tr. 7/28/08 at 102.

- "Fuckin' with the shit they use'n in the Middle East and East Africa, Chinese made or Russian or Romainian made, hammer your brain like eggs this is our brain on tumbers. Don't hold my tongue for mar n****, loud talker not me, mother fuckin' mumbler Jas Coleon good with these hands, a knock out artist grade A rumbler. I don't fuck with suckers so we could never be cool. You ain't getting money or killin' shit so I ain't feelin' it." Tr. 7/28/08 at 102-03.

- "I carry firearms for offense, not defense, locked and loaded. Chest cavities explode with impact from projectiles." Tr. 7/28/08 at 103 (cleaned up).

- "Held accountable for your actions on disk a whole bunch of murder shit you was rappin'. This whole mess you got to ask yourself how did it happen. Now a hole in your chest, your thoughts, you're graspin'. With a hole in your chest your last breath you graspin'. Did you think that vest was going to stop the shit that I up with. Sorry, pal guess you're wrong about the vest, you failed a physical challenge. Maybe the mortician can fix your face and make it look like you was smilin'. I'm smilin' while relaxin' in the Hawaii islands. Homicide cases investigators to me try to tie in." Tr. 7/28/08 at 103.

- "Thought it was just rap with this much money . . . . N****s kill and die for way less just progress." Tr. 7/28/08 at 103.

- "At the funeral they gonna be singin' goin' up younger. The family know why he dead, he fucked with the wrong n****. Ain't no need for them to wonder. The boy layin' in a rented casket with a white tie. After the service they gonna cremate the bastard. He's fuckin' headed and showed up when it was time to shoot. He froze up and started shooting from a distance. Shot in the face when he got close. He got his pretty ass picture printed in those dingy ass shirts and it's gonna be a few more die'n from that boy's turf. You take this beef shit for real, it's kill or be killed." Tr. 7/28/08 at 103-04.

- "Commit murders leavin' no traceable evidence." Tr. 7/28/08 at 104 (cleaned up).

- "Did I walk up and stand over, keep squeezing and the games over all of this cause I was living life flashy. You're a bitch sneakin' up on me, but

I don't fuck for free.  Try to prove how tough you be and you squeezed at me, but you didn't kill a G.  7.26 308's and 223's, I'm stayin' with these.  Ain't playin' with these." Tr. 7/28/08 at 104 (cleaned up).

- "I possess in many arsenal and know how to organize murders motha fucka, the last of a dying breed when you and the bitch got hit.  The lung damage made it hard to breath, the bullet in your spine made it hard to walk." Tr. 7/28/08 at 104.

- "King of the Bay I represent my throne.  This is more than music, it's the way I do it.  Thought it was just rap, now you got to face the music." Tr. 7/28/08 at 136.

That last lyric was the last piece of testimony the jury heard in the liability phase of the trial.

These lyrics featured prominently in the prosecution's closing argument.  The prosecution quoted three sets of lyrics at the very start of the initial closing argument. Tr. 7/29/08 at 4.  It quoted one of those sets of lyrics at the very end of the initial closing argument.  *Id.* at 26-27.  And it referenced the lyrics yet again at the very end of the rebuttal closing argument.  *Id.* at 83-85.

The defense attorney provided deficient performance by failing secure a ruling on the motion in limine and by failing to object to the introduction of these lyrics at trial.  The attorney correctly filed a motion in limine.  While the court apparently never definitively ruled on the motion (except potentially insofar as the lyrics appeared in letters that Mr. Mathis sent to Ms. Carpenter), the court repeatedly suggested the lyrics were irrelevant and therefore inadmissible.  The attorney should've ensured the court ruled on the motion in limine.  In the alternative, the attorney should've objected at the time of trial.  During the post-conviction evidentiary hearing, the attorney said he argued to keep out the rap lyrics and the court rejected the argument. Tr. 4/23/19 at 24-30.  To the contrary, it appears the court never explicitly

ruled on the motion, and indeed the court telegraphed its view that the lyrics were irrelevant (except potentially to the extent they tied into Ms. Carpenter). As the attorney's testimony indicates, there was no strategic reason to avoid securing a ruling or avoid objecting; rather, the attorney erroneously concluded the court had denied the motion in limine and so erroneously failed to take those steps. Indeed, the Nevada Supreme Court indicated in the post-conviction appeal that the attorney provided deficient performance regarding this issue because most of the lyrics were irrelevant (or because any probative value was outweighed by the danger of unfair prejudice).

The error was prejudicial. Had the attorney objected or insisted on a ruling, and had the court responded reasonably, the court would've excluded the lyrics—as it telegraphed it would. Had the court excluded the lyrics, there's a reasonable probability the jury would've reached a more favorable verdict. Indeed, the lyrics were highly damaging other bad acts evidence that portrayed Mr. Mathis as a person with a propensity toward violent behavior, and the jury received no limiting instruction regarding the lyrics. Mr. Mathis is therefore entitled to relief.

**Ground Four: Mr. Mathis's attorney provided ineffective assistance at the penalty phase of the trial, violating Mr. Mathis's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

**Statement regarding exhaustion:** Mr. Mathis litigated this claim or a substantially similar claim in his state post-conviction proceedings.

**Statement in support of claim:**

The right to effective assistance of counsel extends to a non-capital sentencing or penalty phase. Here, Mr. Mathis's attorney expressed a total unwillingness to participate meaningfully in the penalty phase. The error amounts to either ineffective assistance or a constructive denial of counsel. Mr. Mathis is entitled to a new penalty phase.

If the jury convicts a defendant of first-degree murder in Nevada, the parties have the right to a penalty phase on the first-degree murder charge, even in a non-capital case. The parties can waive the penalty phase and have the court conduct the sentencing, but the parties need to agree to waive the penalty phase.

The transcript of the penalty phase appears to begin mid-argument: the court explains to the defense attorney that the prosecution is unwilling to waive the penalty phase. Tr. 7/30/08 at 4. The defense attorney says, "[Y]ou can sentence him to the max. . . . Go ahead and sentence him to the max." *Id.* at 4. "I'm telling you you can sentence him to the max. This is a waste of time." *Id.* at 5. "It's futile to have this." *Id.* "Whatever Your Honor chooses, whether it be the max or not, we are open to having you sentence him to that." *Id.* at 6. At that point, the attorney backtracked slightly, suggesting he wasn't offering to "stipulat[e] to the max." *Id.* Then the attorney asked, "Can I have an associate sit in for me during this?" *Id.* The court responded, "No." *Id.* at 6. The attorney said, "It's not going to matter. It doesn't matter." *Id.* The court said, "You owe it to that man there to sit in here on this case." *Id.* The attorney said Mr. Mathis didn't care, and the court again said no. *Id.* at 6-7.

The attorney continued to rant. "This is called being a sore winner. . . . A waste of court time, taxpayer money, you name it across the board. Sentence him to the max, Your Honor." Tr. 7/30/08 at 7. Soon after, one of the prosecutors said the defense attorney was calling the other prosecutor a "fat, sloppy fucker and a slob." *Id.* at 10. While the prosecutor was making that statement, the defense attorney said "Slob." The attorney then said, "You know. Walks like a duck, talks like a duck. . . . The truth is an absolute defense to anything that is hurtful." *Id.* The court admonished the attorney to "act professional" because "the jury is coming in." *Id.*

The defense attorney waived an opening statement. Tr. 7/30/08 at 11. He declined to cross-examine the State's first two witnesses. *Id.* at 17, 19. He conducted a brief cross-examination of the third witness, the lead detective; the cross-examination

28

focused on Ms. Rowel.  *Id.* at 40-46.  He declined to cross-examine the State's fourth witness.  *Id.* at 49.  The defense briefly called one witness, a defense investigator, to discuss Ms. Rowel.  *Id.* at 50-56.  The defense presented no mitigation evidence whatsoever involving Mr. Mathis's character.

Mr. Mathis presented a disastrous allocution.  He said he didn't know the victims, so he couldn't "express any remorse."  Tr. 7/30/08 at 59.  He said "these type of things do happen within the streets."  *Id.*  The attorney asked him what he would do with his life if the jury sentenced him to life with parole and he received parole.  Mr. Mathis answered, "I'm not going to do no 40 years.  I'm going to get back on appeal in close to five years."  *Id.* at 60.  "My mentality is like, excuse my language, I'm like, fuck it, if you give me life without parole it's the same as 40, without life, or whatever."  *Id.* at 61.  "[I]f you give me life without parole, my mentality is going to be like, fuck it, excuse me, and if you give me 40 to life, my mentality is going to be the same way."  *Id.*

The defense presented a brief closing argument that barely exceeds a full transcript page.  Tr. 7/30/08 at 66-68.  The jury elected to impose life without parole.  *Id.* at 70-71.

The attorney testified at a state post-conviction hearing.  He said he knew Mr. Mathis was angry with the verdict, which was partly why they both wanted to waive the penalty hearing; likewise, the attorney knew Mr. Mathis was likely to alienate the jury during allocution and recommended against Mr. Mathis giving an allocution.  Tr. 4/23/19 at 30-34.  The attorney couldn't say whether they discussed the penalty phase before the liability phase started.  *Id.* at 34-35.  The attorney said there wasn't much mitigation, and Mr. Mathis's mother refused to testify.  *Id.* at 35, 39, 48.  He admitted he began swearing at the prosecutor because the prosecutor wouldn't waive the penalty hearing.  *Id.* at 50-51.

1    The attorney provided deficient performance at the penalty phase—indeed, the
2  performance was so atrocious that it amounts to a constructive denial of counsel.  The
3  attorney was belligerent on the record because the prosecutor wouldn't waive the
4  penalty phase.  The attorney repeatedly suggested he would stipulate to the maxi-
5  mum sentence; at one point, he appeared to walk that offer back, then he made it
6  again.  He asked if he could leave and have an associate fill in for him.  As his state-
7  ments indicate, he was completely disinterested in and unwilling to conduct a penalty
8  phase.  His attitude showed in his performance.  He waived an opening statement.
9  He chose to cross-examine only one of the four State's witnesses and called only one
10 witness of his own.  The testimony he elicited from these two witnesses was focused
11 solely on Ms. Rowel and had nothing to do with Mr. Mathis directly.  He presented
12 no evidence whatsoever about Mr. Mathis's character, upbringing, or any other rele-
13 vant mitigation topics.  He failed to prepare Mr. Mathis to provide an appropriate
14 allocution, and Mr. Mathis's allocution was utterly disastrous.  He provided a weak
15 and brief closing argument.  His conduct during the penalty phase failed to come
16 anywhere close to professional representation.

17    The error was prejudicial.  The attorney's performance was so poor that it
18 amounted to a constructive denial of counsel, so the Court should presume prejudice.
19 In the alternative, it's reasonably probable that if the attorney provided a competent
20 mitigation presentation at sentencing, the jury would've reached a more favorable
21 penalty verdict.  Mr. Mathis is entitled to a new penalty phase.

22
23
24
25
26
27

**Ground Five: The State failed to disclose impeachment material regarding Inspector Robert McMillan, violating Mr. Mathis's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

**Statement regarding exhaustion:**  Mr. Mathis hasn't fairly presented this claim in state court.

**Statement in support of claim:**

Mr. Mathis maintains—on information and belief—that the State failed to disclose material impeachment information regarding Inspector Robert McMillan.  *See Brady v. Maryland*, 373 U.S. 83 (1963).

Inspector McMillan was a significant witness at trial.  Among other things, and as Grounds One and Three(A) explain, Inspector McMillan provided the foundation for admitting Ms. Rowel's alleged statement to the effect that Mr. Mathis had told her he committed the murders.

Inspector McMillan has a checkered record.  One prominent example involves the wrongful conviction of Jamal Trulove for the murder of Seu Kuka in July 2007 (which occurred while Mr. Mathis's case was pending trial).  The victim was shot on a sidewalk outside a housing project in San Francisco.  The police conducted two photo lineups with an eyewitness, Priscilla Lualemaga.  In the first lineup, she failed to identify Mr. Trulove.  *Trulove v. D'Amico*, No. 16-cv-050-YGR, 2018 WL 1070899, at *1 (N.D. Cal. Feb. 27, 2018).  During that lineup, one of the officers pointed to the photo of Mr. Trulove and asked her if she was sure it wasn't him; she said she didn't know.  *Id.* at *2.  In the second lineup, she identified Mr. Trulove as a potential suspect.  *Id.*

Ten months after the murder, in June 2008 (just before Mr. Mathis's trial), Inspector McMillan and another officer conducted a traffic stop of Latisha Meadows and arrested her for possession of drugs and a stolen gun.  *See Trulove*, 2018 WL 1070899, at *2.  She claimed she'd witnessed the murder and gave a statement to

31

1    Inspector McMillan and another officer. *Id.* Some of the details were consistent with

2    Ms. Lualemaga's statement, but other details were inconsistent with known facts

3    about the murder. *Id.* The police showed her a lineup, and she identified Mr. Trulove.

4    *Id.* The police then released her and declined to pursue charges against her. *Id.*

5        A couple months after Inspector McMillan spoke with Ms. Meadows, the state

6    of California decided to prosecute Mr. Trulove for the murder. *See Trulove*, 2018 WL

7    1070899, at *3. A jury convicted him, but a state appellate court reversed. *Id.* At a

8    retrial, the jury acquitted Mr. Trulove. *Id.* He then filed a federal civil rights lawsuit

9    against the police for the wrongful conviction. Inspector McMillan was one of the co-

10   defendants.

11       The federal district court denied Inspector McMillan's and most of the other

12   co-defendants' motions for summary judgment and their corresponding requests for

13   qualified immunity. It found there were sufficient triable issues of fact involving

14   Mr. Trulove's claim that Inspector McMillan deliberately or recklessly fabricated ev-

15   idence. A reasonable jury could conclude Inspector McMillan "knew, or recklessly

16   disregarded, the falsity of Latisha Meadows' identification of [Mr. Trulove] as the

17   shooter." *Trulove*, 2018 WL 1070899, at *5. "The evidence of coercive circumstances

18   and reckless disregard of the falsity of Meadows' statement—the circumstances un-

19   der which it was obtained, the inconsistencies with the known facts, and the details

20   omitted from the officers' reports—is, standing on its own, sufficient to permit a rea-

21   sonable jury to find that McMillan . . . knew, or [was] deliberately indifferent to those

22   circumstances yielding false information." *Id.*

23       The court also concluded there were sufficient triable issues of fact involving

24   Mr. Trulove's claim that Inspector McMillan deliberately or recklessly failed to dis-

25   close exculpatory evidence. A reasonably jury could conclude Inspector McMillan and

26   other officers "failed to disclose exculpatory evidence concerning the circumstances

27

1    under which the eyewitness identifications and statements were obtained." *Trulove*,

2    2018 WL 1070899, at *6.

3        For similar reasons, the court found triable issues of fact involving

4    Mr. Trulove's corresponding malicious prosecution and conspiracy claims. *Id.* at

5    *Trulove*, 2018 WL 1070899, at *8-*9.

6        The case proceeded to trial. The jury returned a verdict in favor of Mr. Trulove

7    as to two co-defendants (but not Inspector McMillan). *See Trulove v. San Francisco*,

8    No. 16-cv-050-YGR, 2018 WL 3429113, at *1, *4 n. 2 (N.D. Cal. July 16, 2018).

9        Separately, the San Francisco District Attorney's office sent a letter to defense

10    attorneys on September 23, 2011, acknowledging that Inspector McMillan "has ma-

11    terial in his personnel file . . . that may be subject to disclosure under *Brady*." PEx.

12    3. Assuming this *Brady* material existed at the time of Mr. Mathis's July 2008 trial,

13    it should've been disclosed to the defense beforehand.

14        Mr. Trulove's case and the San Francisco DA's letter both provide Mr. Mathis

15    with a good faith basis to allege on information and belief that additional impeach-

16    ment information exists involving Inspector McMillan and his potential misconduct

17    leading up to the time of Mr. Mathis's trial. Mr. Mathis is filing a corresponding

18    discovery motion seeking to subpoena relevant entities (such as the San Francisco

19    Police Department) for potential impeachment information involving Inspector

20    McMillan. The Court should grant the discovery motion. If the discovery process

21    leads to impeachment information involving Inspector McMillan, Mr. Mathis would

22    likely seek leave to amend this petition to include this information in this claim for

23    relief.

24        Assuming such impeachment information exists, the State was in constructive

25    possession of the information and failed to disclose it to the defense before trial. The

26    information was material. As Grounds One and Three(A) explain, Inspector McMil-

27    lan was an important witness: notably, he laid the foundation for Ms. Rowel's alleged

statement that Mr. Mathis made incriminating statements to her. Had the jury learned about potential impeachment information involving Inspector McMillan, the jury would've likely drawn adverse credibility determinations regarding his testimony. In turn, there's a reasonable probability the jury would've reached a more favorable verdict. Assuming the impeachment information exists, Mr. Mathis would be entitled to a new trial.

### PRAYER FOR RELIEF

Accordingly, Mr. Mathis respectfully requests this Court:

1.     Issue a writ of habeas corpus to have Mr. Mathis brought before the Court so he may be discharged from his unconstitutional confinement;

2.     Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this amended petition and any defenses that may be raised by the State; and

3.     Grant such other and further relief as, in the interests of justice, may be appropriate.

### DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada the facts alleged in this petition are true and correct to the best of my knowledge, information, and belief.

Dated October 13, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Jeremy C. Baron*
Jeremy C. Baron
Assistant Federal Public Defender

34